The clerk call the next case please. 313-0152, the people of the state of Illinois, by Mark Costle and Lee Ponshe, appellant by Steven Wilkin. Mr. Wilkin, good afternoon. Good afternoon, your honors. My name is Steven Wilkin. I'm with the Elgin Office of the State Appellate Defender and I'm here on behalf of Mr. Ponshe. My pleadings, your honors, raise three issues. The first relating to effective assistance of counsel, the second relates to sentencing, and the third involves instructional error. Now and then, your honors, you run across a legal problem and it's kind of difficult to find some authority that deals with it. And I found the Fields case, it's about the only case I could find, that deals with the assessment of a defense lawyer being introduced in a case. And one might think that that creates a real problem for me. But if that's what you thought, you would be wrong, because the dearth of case law on this is readily explicable because no one in their wildest legal imagination would consider that. The jury ought to hear that a defense lawyer thinks defending the case is going to be fucking rough and really fucking tough. It's just unheard of. And my opponent talks a lot about, well, what is the call subject to suppression and attorney-client privilege. What they don't talk about is kind of like the elephant in the room, and that is how is this relevant at all to a legal proceeding? How is an attorney's assessment of the merits of a case, especially a defense lawyer's assessment, especially one so negative, relevant? I'd like to engage the court in a little thought experiment. Imagine, if you will, if my client and his father had this conversation. And my client's father said, well, I talked to our lawyer, Mr. Goldstein. And Mr. Goldstein had a conversation with the assistant state's attorney handling the case. And the assistant said, in a moment of candor, maybe speaking out of school, that there was considerable debate in the state's attorney's office about whether this was actually a murder case. But due to political considerations, they decided to make it a murder case. And we might be happy to negotiate it, though. I think, in that event, the state's attorney is going to be arguing a large part of what I'm arguing right now. Well, they're going to dispute the factuality of all those utterances, for starters. If they concede it, they're going to say it's all work product. It's all intangible work product. It's an attorney's opinion about the merits of the cause. They're going to say that the jury's going to consider that for the underlying truth of matters asserted therein. They're going to say it's irrelevant. But more than anything else, they're going to say, look, we can cure this problem by simply redacting the conversation. The jury doesn't have to hear this. And neither the defense nor the prosecution would have been impaired at all. I want to kind of move to the harm issue on this because I think this is a problem in all these cases. One of the things I expected to hear from my opponent, but I didn't, is that, you know, we've got a five or six-day jury trial. It's a lengthy trial. This is a 20-minute phone call, where the defense counsel is saying defending this is going to be so difficult. That's only seconds. But consider this. It's an isolated reference in this trial. But this evidence is unique. It's kind of one-of-a-kind in this trial. We have these experts, forensic pathologists, and of course we have experts on fingerprints and experts on DNA. And then we have lay witnesses. But the experts, their testimony is almost choreographed. They testify from reports and that. The lay witnesses, it's question, answer, question, answer. No doubt, your Honor, this is probably heard the expression or maybe even uttered it yourself. I sure wish I would have been a fly on the wall during that conversation. And that's what this phone call is all about. There the jury is and they're a fly on the wall and there's this brutally candid conversation. It's going to be fucking rough to get you out of this. It's going to be really fucking tough. And you know what our defense is going to be? Our defense is going to be, well, blah, blah, blah, blah, blah. The other thing is the timing of this call. This call was played at the conclusion of the state's case, just before, in other words, the defense case. In other words, the jury's impression of the defense case was essentially anchored with this phone call. It was like, imagine a second, imagine defense counsel had elected to make his opening remarks at the conclusion of the state's case. So here we have this introduction to the defense case that is basically a denigration of the defense. And another thing is that we spend so much time instructing juries on concepts like reasonable doubt and presumption of innocence and it's the state's burden to carry this. How is the jury to square this with defense counsel's statements? If they had a reasonable doubt about something, how do they square that with defense counsel's assessment of the defense? What about the burden of proof? What about presumption of innocence? He's presumed innocent by, you know, his own lawyers. He's been pretty negative on this from day one. And then of course, you know, we've got this flip kind of comment that defense counsel says that, well, our defense is going to be blah, blah, blah. And let's just assume for a moment that the instructional error claim is not here and this is murder or not. That's what it is. Dr. Bloom testified that he could not concur with Dr. Mitchell's assessment that this child died of a closed head injury due to blunt trauma. And make no mistake about it, Dr. Bloom would have been the state's witness in this case. That's why he would have been the state's witness, but he didn't agree with Dr. Mitchell. That's why we have Dr. Morganis. And one of the things that comes through the state's brief is that, well, Dr. Bloom suggested that we should have a neuropathologist look at this. And that happens to be Dr. Org Adams. And so Dr. Bloom is deferring to Dr. Org Adams. And has basically become a convert to what Dr. Org Adams thinks. That's not true at all. Because on redirect examination, Dr. Bloom says, and I believe it's on page 1697 of the record as a matter of fact, he says, I've looked through Dr. Org Adams' report and she still doesn't walk me through the steps. I still can't get to where she goes. If I could move on to the sentencing issue for a moment. If I get this right, the Illinois Supreme Court invalidated Public Act 89-203 in November of 1999. That is almost 16 years ago. There is not a single reported case, and there's not a single case period even unreported that I'm aware of, that says that that public act was reenacted. If it has been, this is a very, very well kept secret in Illinois law. Public Act 89-203 struck down the mandatory natural life provision for offenders in my client's position. It has never been reenacted. And I think the nub of the problem gets down to this. Public Act 89-462, which they contend reenacted the offending portions of 203, says this, and adds only this, the court shall sentence the defendant to a term of natural life imprisonment when the death penalty is not imposed. That's 89-462.  The language describes the offender, and that offender is a person who at the time of the commission of the murder had attained the age of 17 or more and is found guilty of murdering an individual under 12 years of age. That was never reenacted. I think maybe at the end of the day, maybe the argument is something akin to an argument that, well, it's still in the code. I mean, yeah, if we crack the code, we can still find this language, and it seems, well, it's there. But consider this. Taking you back all the way to 1986, the Illinois Supreme Court struck down section 122-8 of the Post-Conviction Hearing Act, which required a different judge to hear a post-conviction hearing, and that was struck down on separation of powers. So it could never be reenacted. But that appeared in the code for years. As a matter of fact, the legislature didn't repeal that until 2010. That offensive provision was in the code. It was there right in West for 24 years. So in conclusion, no matter what, my clients, it has to be resent. So let me make sure I understand. Your contention is that although the Supreme Court found the statute was unconstitutional and has continued to sentence people according, or to validate sentences of people who've been sentenced according to that statute, that they really should not have been doing that because it's never been reenacted by the legislature. Exactly, it has never been reenacted. There's probably, by my research, about, I think there were about seven cases. Puevito, of course, is one of them, so perhaps I should say six, wherein an appellate court has vacated one of these sentences of mandatory natural life and remanded for a new sentence hearing. There was a case from this court, the defender's name was Trent. I don't know the man's first name. And that was a similar situation. It was remanded for another sentence hearing. So I'm just not aware of any case that says the statute has been reenacted and I'm not aware of any case where remands don't take place. Okay, maybe I'm missing something, but it seems to me that the state has cited in its citation to additional authority several cases where the Supreme Court has upheld those sentences. Those were double murders. Okay. That was a different type of an offender. I think every single one of them was a double murder case. Or it may have been some other classification of murder, but it wasn't this classification. So, indeed, that is part of 89462, that it recites kind of a litany of offender classes. But the cases in that motion to add authority do not involve murders of persons under 12. Even though the language is different. Yes, it's different. Frankly, I don't know what precedential value that has, those cases. Okay. Can I hark back a minute to your first argument? Sure, I'd be delighted. The defense attorney himself argued for a non-redacted transcript, and I'm sure that that's the basis for your saying that he was ineffective as counsel. Of course. There was nobody seeking that redaction. So is it part of your argument that the trial court erred in not taking that out? Let me preface my argument. I should have done this earlier. I don't like raising ineffective assistance of counsel claims. And I don't like pointing fingers at blame anymore. I realize that in a trial, oftentimes things happen fast and furious, and obviously representation is an art, it's not a science. But the trial lawyer was absolutely sleeping at the switch. He could not have read the transcript of that phone call. I mean, good Lord, the state had prepared a transcript of that phone call with a red line through the various portions that they wanted out. And that is part of the record on appeal. So it was plain to see what they proposed to have excised. But he insisted, defense counsel insisted, that it all go forth. And then after the tape of this conversation was played, he said, what about the stuff about the lawyers? I thought that had been removed. And he was absolutely wrong. Even, however, I will say this, even, however, if he was faultless, I think the state's attorney's office and the trial judge bear some blame here. Because as I pointed out earlier in this argument, it's just unheard of for a trial lawyer's opinion, especially a dour one, a negative one, to be heard by a jury. Actually, there's even case law that it's improper for a state's attorney to argue in closing argument that he personally believes the defendant's guilty. He can't do it. How is it that the defense attorney, we can bring in evidence that the defense attorney thinks defending the case is going to be so difficult. If I could speak briefly about the instructional problem. The law is that if there's slight evidence to support an instruction, the defendant should receive it. And because law on this is relatively simple, I just have a slight argument. The trial judge thought that this instruction was inappropriate because the defendant engaged in deliberate acts. But pursuant to defenso, an actor in this situation can act deliberately. He can act with intent as to the conduct, but be reckless as to the result. If he's reckless as to the result, he can still receive an instruction on involuntary manslaughter. And Dr. Bloom testified that this child had conclusions about her head. And he said that some of these could have been caused by a fall into the crawl space. Juries are the judges of the credibility of witnesses and the weight to be given in their testimony. And under those circumstances, the jury could have found that some of those injuries which the victim sustained were caused by the fall and some were caused by the defendant. Then they would have been tasked with determining whether they could infer that the acts caused by the defendant were accompanied by a mental state of a strong probability of death or great bodily harm. And that, in sum and substance, is the argument. And for foregoing reasons, Your Honor, I would request that the defendant's conviction be reversed. Because of the offensive phone call, because of instructional error, and in all events, my client should be re-sentenced. If there's any questions. Thank you. Thank you, everyone. Mr. Austell. Good afternoon. May it please the Court. Counsel. I'll go through this issue by issue. The first issue, the defendant claims he was denied, in effect, that he was denied effective assistance of counsel where his attorney allowed the jury to hear a redaction of a recorded jailhouse phone call. And as we noted in our brief, the defendant does not argue that the admission of the recording itself was error. He does not raise a reasonable doubt argument. So, therefore, he's forfeited these issues on appeal. The defendant himself engaged in a voluntary jailhouse phone call with his father. He knew that the call was being recorded. He knew that third parties would be reviewing his call. And he made inculpatory statements, admissions, during this recorded call. In a trial, a redacted recording of the jailhouse conversation between the defendant and his father was admitted into evidence. During call, the defendant admitted that he struck the 18-month-old victim, and she later died, of course, as a result of blood, force trauma to her head. I don't think the defendant's talking about that part of the call. Is he? Not exactly. No, no. But what I'm saying, Your Honor, is that the recording itself was properly admitted because it had the inculpatory statements in it. And it was a voluntary statement that he made to a family member in the jail setting. There was no police officer involved with this. And in this case, the motion to suppress should have been the denial of the defendant's motion to suppress should be affirmed because of these inculpatory statements. But as what you're saying, of course, you're addressing the father's statements of what he claimed the defense counsel said. That's right. As he noted, though, as a matter of trial strategy, the defense counsel wanted to initially admit everything, including all these statements that the father made that are now being challenged. What kind of trial strategy is that? Well, in this case, he wanted to use this entire record, according to the record that we had, to show parts of that unredacted conversation to make the best light, put his client in the best light possible through all of the recording. That's what he claimed he wanted to do at the time that he asked for this whole thing. The state thought that it was inappropriate. They redacted it. Right. And now you're going to argue that it was okay? Well, what I'm going to argue is that at this time, this was the defendant's counsel anyway. He never hired Mr. Goldstein at that time. He never spoke with Goldstein. He did not know Goldstein's name. His mother had spoken to a second attorney. He didn't know that second attorney's name. His father had spoken to Goldstein. His father claimed to have hired Goldstein. His father didn't quote Goldstein, but he said all the language that the defense counsel quoted to you. But nobody said that the defense counsel said that. And if you read the language between the father and the son during this entire discourse, they're pretty vulgar guys. I have to admit that I have not encountered a defense counsel, an attorney anywhere, who would be speaking to a client in rather vulgar terms to assess the case. The father said that he had talked to Goldstein. He said him by name. The son did not know Goldstein at this time. If you read the transcript and such of that whole pretty good outline of this, I believe it's on page 18 of the defendant's brief. He goes through a lot of it. Of course, the entire transcript's in the record also. So that one little paragraph that we're talking about was part of a much larger conversation that went on. Right. And isn't that the state initially wanted to redact a large portion, not just this paragraph, but a lot of other things that the defense attorney said no. Some of this has to come in as context. And isn't it the argument that he never thought that this part would come in, but the rest of the conversation putting in context where I think the state wanted to put in the portion about, I hit the child and the defense, but we've got to have the context that he said that in. Well, certainly. That was part of what was redacted. So this is sort of at the beginning of the conversation, and then they go through more things. I mean, is that a correct statement or is that? Throughout this conversation at different times there were different discussions from the defendant of making mistakes. You know, I screwed up. I hit the child and this sort of thing. And so this was redacted in order to get those statements in because they were admissions by the defendant. And other aspects of what the defendant said about, I think they were described as ramblings about getting an attorney at some point in the record. And those aren't relevant if he's rambling on about, you know, whatever he needs to get an attorney. At this point he hadn't got an attorney. Goldstein was not his attorney. He had not accepted representation. He had never even spoken to him yet. So even though the father is talking about what Goldstein's thinking about this case, it was the father talking to Goldstein. There's no apparent agency, you know, because we don't have the defendant saying, yeah, I talked to you about getting an attorney. None of that comes out in the conversation. And if he was an agent. Goldstein was, in fact, his attorney at trial, right? He was. He eventually was. That's true. And I'm not sure why that matters that he hadn't hired him technically at that time. The father was obviously pretty close and wanted his son's authority to do it. Apparently, again, in that conversation. But it seems like the problem here is the language itself, of color language, I mean, what he said about the difficulty of the case. The guy who's representing him at the trial. And I mean, I don't think it has to do with attorney-to-client stuff, frankly. It's just what the issue meant to that jury. You know, what those words meant to that jury. Well, in this case, again, we do not have a quote. We have the father saying this is what the attorney said. The father's using his own language. It's obviously vulgar language, the kind of communication they had between each other in that whole conversation. This is not something an attorney would say. I think the jury would understand this is not language coming from the defense counsel himself. It's not the language that bothers me. It should, but it's not the language. The essence of what he was saying. The same fellow, who did turn out to be his lawyer, was there in front of the jury arguing his case. He said, if he'd said, well, the lawyer says this is really a tough case, really miserable, rough, rough case. I don't think it would have mattered. I mean, whether he quoted him or not, whether the lawyers, the word was rough or horrible or extremely difficult. I mean, how the father translated that may or may not be valid. But it's apparent he didn't tell the father, no problem, we'll handle this. Certainly. Your son is not guilty. I don't disagree with that assessment at all. He probably did say this was a difficult case. And if you look at all the evidence that was presented, it is a difficult case. It was a difficult case to win, because we have a lot of evidence that showed. We have Dr. Rourke Adams, who was very compelling in her testimony, and there were two defense experts. But obviously the jury accepted the testimony of Dr. Rourke Adams as to the causes of the injuries from the blunt force trauma. We also have the ex-girlfriend talking about her 18-month child being injured in the care of the defendant. And he told her when they went to the emergency room, hide the fact, you know, say that the child fell off a toy. You're making a slightly different argument. Not a bad argument, but a different argument, which is that it's horrible. I'm sorry? I said you're making a slightly different argument now. Right. Which is that it's horrible. What I'm saying is that because it is harmless, because we've got this overwhelming evidence, and even if this was improperly admitted, we have tremendous evidence that puts the defendant, that has him committing this crime, that has him causing the death of this child. So even if this brief statement, the one paragraph that came out, is wrongly admitted, it is harmless error in this case because of the amount of evidence that was produced to show that the defendant committed this particular crime. Well, is the evidence really overwhelming? I mean, you've got one doctor who's saying one thing, and then you have two defense doctors who are contradicting portions of what she's saying. So, you know, I'm not thinking that it's necessarily accurate to characterize this evidence as overwhelming. There's strong evidence, it seems to me, on both sides. Don't forget the other part of the evidence, Your Honor. I mean, the medical evidence is, of course, disputed. But then we have evidence that he told the mother of the victim that she fell off this toy and hit her head, that she ran into a tailgate of a truck, that she fell into this crawlspace. No, the mother said she ran into the tailgate of the truck. The mother saw that. All right. And she testified to it. But we have extensive injuries to this poor child. Let me look at him. I've got a breakdown of it at some point. She has 25 bruises, extrusions to her head, face, and ears. She has multiple large bruises to her pleural cavity and torso. She has brain trauma. Let's see if I can find it. There we go. Multiple abrasions and damage to upper and lower areas of the spinal cord covering. This is not all going to occur by one fall into a crawlspace. It's not going to occur from one fall from a toy and from a bump of the head on a tailgate. This had to happen from a beating, basically. And that's as Dr. Rourke-Adams said. And, of course, the jury, in convicting, accepted her analysis, her conclusions as to how the injuries occurred. So, again, I think that the evidence and the record in this case points to the defense counsel was not ineffective for failing to keep out this. And even if this shouldn't have come in, as I mentioned before, because of this strong evidence, it would be harmless error. At this point, if I may, I'd like to move on to the sentencing issue. Because we're talking about still that this would have been an unconstitutional sentence, the life sentence. And, of course, Wounders is the case that struck down. The section that's applicable is 735-5-8-1A1C2. And Wounders found that Public Act 89203 was unconstitutional as it violated single subject rule. But before Wounders was handed down, there were two more public acts that came out. One was 89-428, and that one was struck down by the Johnson Court as being also a violation of the single subject rule. But the historical notes in the statute itself say that the third public act, 89-462, reenacted the amendment of this text by Public Act 89428. And the Johnson Court, in its opinion, stated that Public Act 89-462 recodified Article 2 of Public Act 89-428. Now, this statutory section that we're dealing with is in Article 2 of 89-428, that public act. And therefore, under Johnson, our Supreme Court, this particular statute is constitutional. In Smalley, this Court reviewed a case involving the same statutory section and affirmed a life sentence, finding that it did not violate the proportionate penalties clause. Now, if this Court accepts the defendant's argument, none of Section 581 would have been reenacted by 89-462. And the Smalley Court could not have affirmed any sentence under that section because the sentencing statute as a whole would have been unconstitutional, and the sentence would have been void at that time. And as Defense Counsel noted, we did a motion to add authority and added six other cases, two Illinois Supreme Court cases and four appellate court cases, showing that Section 581 is constitutional. All of those cases were decided after both the Wooters case and Johnson. So this statute has long been reenacted. He says that involves multiple murders and not the situation. It's in the same language, Your Honor. If it's under the same statute, it's gone as a whole. They don't parse it out. If it was all part of the single subject rule, it would not have been able to be reenacted, even for the double murders. The Court has no other questions? I would like to know what your response is on the instruction. On the instruction? The involuntary manslaughter? Yes. The defendant argued that he was entitled to the involuntary manslaughter instruction because the death of Hallie, the child, can't be attributed to one specific injury, and he denied actually intending to beat Hallie to death. And of course, the defendant is not entitled to reduce a first-degree murder charge to a manslaughter by a hidden mental state that's only known by the defendant and not supported by the facts. And this Court in Johnson found that those kind of arguments are not persuasive. And in Johnson, this Court noted that the evidence showed that the victim in that case sustained injuries to practically every part of her body after coming to that defendant's care, and that no one injury again could be attributed to the victim's death in that case, but the experts in that case agreed that the victim had been beaten to death. This Court in Johnson found that considering the number and degree of injuries discovered at the autopsy, it is patently inconceivable that these injuries could possibly be the result of reckless conduct. And that's similar in this case. There were too many injuries for this to be reckless. Because we already discussed all the injuries, and you can't reasonably claim that this was just merely reckless activity and that he only struck her twice when all these injuries occurred to her. And our Supreme Court in Ward noted that the defendant's statement in that case that he didn't mean to kill the victim was to be considered evidence that he acted recklessly. Quote, the severity of the beating negates any suggestion that his conduct was only reckless. And they went on, and they quoted from the special concurrence in the appellate decision. Ward Court stated, quote, the beating death of any victim, including a child, which is so extensive as to negate any possibility it was inflected recklessly, is insufficient evidence to support an involuntary manslaughter instruction. And, Your Honors, I believe that those cases, Ward and Johnson, are on point for this particular set of facts. So we ask that you find that the trial judge did not abuse his discretion in refusing to issue the involuntary manslaughter instruction. Any other questions? Thank you, Mr. Estes. Thank you, Your Honors. Mr. Wilkin, any rebuttal? Your Honors, I don't have any rebuttal. Why isn't this harmless? I'm sorry? Why isn't this harmless, sir? I think it hinges on Dr. Bloom's testimony, because Dr. Bloom can't separate these injuries out. The child died of cerebral edema, brain swelling, in the vernacular. And that means that injuries to the head were the cause of her demise. But we don't know how many of these injuries were caused by the fall and how many were from the defendant's hand. And so I guess I'm arguing instruction here. If there's a dispute as to whether this is really reckless, certainly it can't be harmless. The defendant makes a statement, and they make a lot of defendant statements to police. He said it at one point, well, I must have struck her. I must have done this, I must have done that. When people say something like that, Your Honors, I must have done this, I must have done that. Do you know what that means? That means that the speaker doesn't know what they did. It's like, I must have left my car keys in my attaché case. But you go to your attaché case, and they're not there. So he's just speculating. Doesn't he say that in the telephone calls, though, that he hit the child? I'm sorry? Doesn't he say that in the telephone calls that we're referring to? Yeah. In another part of it. Yes, I realize he does. But at that point, he's more or less burned his bridges. He's on suicide watch during the phone call. He says he's in a straitjacket. So even if we, like I say at the beginning of my argument, if we forget the instructional problem, institutionally, the judiciary can't have trial lawyers trashing their client's case. And I can't express it any other way than that. They just can't. And judgments based upon trials where we have that feature just can't survive. So in other words, it's a species of plain error, structural error, where essentially the lawyer is no longer acting as an advocate. That's why it's not harmless error. Okay? Any other questions? Thank you. Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible.